

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Horlie DeWayne Hale*

**United States Bankruptcy Judge**

**Signed August 25, 2010**

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **SJT VENTURES, LLC** | § | **Case No. 09-36758 HDH-11** |
| | § | |
| **Debtor** | § | |

### MEMORANDUM OPINION ON CONFIRMATION
### OF AMENDED PLAN OF REORGANIZATION

The issue before the Court addressed by this opinion is the appropriate rate of post-confirmation interest in a Chapter 11 plan for repayment of an over-secured debt backed by real-property collateral.

On July 19, 2010, this Court considered the Amended Chapter 11 Plan of Reorganization (the "Amended Plan") filed by SJT Ventures, LLC (the "Debtor"), and the objections to the original plan filed by Aurora Bank ("Aurora"), a secured creditor in this action. Debtor seeks to confirm the Amended Plan over the objections of Aurora, pursuant to 11 U.S.C. § 1129(b). Aurora, for its part, raises objections regarding the post-confirmation interest rate appurtenant to its allowed secured claim and the feasibility of the Amended Plan. Because this matter raises an issue of developing bankruptcy law—post-confirmation interest rates for oversecured debts—the Court now enters this

memorandum opinion, which constitutes Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7052.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 151, and the standing order of reference in this district.  This proceeding is core, pursuant to 28 U.S.C. § 157(b)(2)(A), (K), (L) & (O).

## I.    Factual Background

The Debtor purchased a four-story commercial building located in Dallas, Texas, in July 2007.  The purchase of the building was initially financed through Lehmann Brothers, and the note was later transferred to Aurora Bank ("Aurora").  At the time of purchase, the business venture benefitted from a robust economy and the property was almost fully-occupied with tenants.  However, beginning in mid-2008, concurrent with the overall national economic downturn, the Debtor began losing some tenants and receiving bad checks from others.

The Debtor attempted to work out an arrangement with Lehmann Brothers regarding past due mortgage payments, but the two parties were unable to reach agreement.  The Debtor subsequently filed this voluntary petition in October 2009.  Since filing, the Debtor has been able to secure more tenants.  Occupancy has now risen to 84%.  The office building at the heart of this bankruptcy is classified as a B-Class property, and is currently valued by the Dallas Central Appraisal District at $2,298,000.

### Basic Components of the Plan

The original plan was filed on April 16, 2010, with the Debtor's intention being to finance plan payments through continued business operations.  The two secured creditors in this bankruptcy proceeding are Aurora and First Community Bank Central Texas ("FCB").  Under the original plan, Aurora's secured claim was to be paid in full over sixty months, with the allowed amount of

$1,892,121.79 amortized over thirty years, with a 5% interest rate per annum. At the confirmation hearing, the Debtor orally amended the plan to provide repayment of Aurora's claim at a 6.35% interest rate with a five-year balloon payment. FCB's secured claim of $141,427.48, for leased equipment, would be paid over a period of fifty-two months, and the Debtor would market FCB's collateral (the leased equipment) for sale, which proceeds could then be used to satisfy unpaid interest on the debt. Unsecured claims, including the $1,226,000 unsecured claim of the Small Business Administration would be paid 5%. All classes of creditors, except for Aurora, accepted the original plan.

Aurora filed an objection to the original plan on May 10, 2010. Aurora objected to the feasibility of the original plan and also the cramdown rate of interest offered on its secured claim (originally 5%). Aurora argued that since it is fully secured, it ought to be paid the contractual rate of interest, 8.69%.

*Expert Evidence*

Debtor argued that the correct rate of interest on the secured claim of Aurora Bank should be the market rate of interest, and offered expert testimony regarding that rate. Mr. Robert Dohmeyer, an Accredited Senior Appraiser, opined that the market for B-Class office property derives interest rates based on a "spread" above the Treasury Bill survey. Mr. Dohmeyer testified that the standard spread, for a 30-year amortized loan of approximately $1,900,000 with a 5-year balloon payment, is 300 points above the 5-year T-Bill rate where there exists a 65–70% debt-to-capital ratio. Debtor's secured debt to Aurora currently has an approximately 82% debt-to-capital ratio. Expert testimony provided that practice in the industry would be to incorporate additional spread points to account for the increased risk of the higher debt-to-capital ratio—Mr. Dohmeyer

allotted a 50% increase in spread points, or 150 points, to represent this increased risk.  At the time of confirmation the T-Bill rate was 1.85%, and the calculation offered by Mr. Dohmeyer would add a 450 point spread to that rate, for a total post-confirmation interest rate of 6.35%.  The Debtor amended the Plan to comport with this testimony.

## II.     Analysis

The Bankruptcy Code provides that a debtor may confirm a plan over the objections of at least one class of creditors ("cramdown") subject to, among other requirements, that the plan provide for "fair and equitable" treatment of secured creditors.  11 U.S.C. § 1129(b).  "Fair and equitable" treatment of secured claims is defined as comprising of one of three options: 1) that the holders of the liens retain those liens and receive plan payments totaling "at least the allowed amount of such claim, of a value, as of the effective date of the plan;" 2) for the sale of the secured collateral with the creditors' liens attaching to the proceeds of the sale; or 3) for the realization of the creditors of the "indubitable equivalent" of their secured claims.    11 U.S.C. § 1129(b)(2)(A).    As in most Chapter 11 cases, Debtor seeks to invoke the first option and pay the secured creditors the present value of their claim over a period of time.  In the Chapter 13 context, the Supreme Court has ruled that the present value of a secured claim includes an interest rate when that value is to be repaid to the creditor over a period of time, based on the deprivation of immediate use of the funds suffered by the creditor.  *Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2005) ("*Till*").

The question then before the Court is a narrow one: how to determine the appropriate rate of post-confirmation interest in a Chapter 11 plan for repayment of an over-secured debt backed by real-property collateral.

*"Contract" Post-Confirmation Interest Rate: Not the Rule*

Aurora argues that the contract interest rate in the original promissory note should apply after confirmation of the Plan. It pointed to the recent decision of the Bankruptcy Court of the Eastern District of Texas in the case of *In re Good* in support of that position. The bankruptcy court in *Good* found that an oversecured creditor is entitled to have his interest valued according to the appropriate contractual rate (even a default rate) when the debtor is solvent and could potentially afford to repay at the contract rate. *In re Good*, 413 B.R. 552, 558-59 (Bankr. E.D. Tex. 2009), *aff'd* 428 B.R. 249 (E.D. Tex. 2010). The debtor had outlined that he would have an accumulated cash balance of approximately $85,000,000 at the conclusion of four years of plan payments. *Id.* at 553. The bankruptcy court found that, where repayment at the contract default rate of 15% would "simply reduce the $85,000,000 in equity that may be available to Mr. Good at the conclusion of the plan in four years," there was no need to reduce the interest rate to the creditors from what they would have received under the original note. *Id.* at 560.

The bankruptcy court arrived at its decision by relying on the Sixth Circuit's decision in *Dow Corning*, in which that court approved of an award to the creditors representing accrued interest at the contractual default rate. *Id.* at 558. The *Dow Corning* decision recognized that "the only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full." *In re Dow Corning Corp.*, 456 F. 3d 668, 695 (6th Cir. 2006). That was clearly not the case with the debtor in *Good*, and so the bankruptcy court declined to reduce the interest rate after confirmation. *Good*, 413 B.R. at 560.

However, with due respect, the bankruptcy court's reliance on *Dow Corning* for its decision in *Good* may be misplaced. *Dow Corning* involved a dispute about the interest rate to be assessed during the pendency of the bankruptcy, pursuant to 11 U.S.C. § 506(b), not the post-confirmation interest rate on payments going forward. 456 F. 3d at 672. As noted recently in this district by Chief Bankruptcy Judge Houser in an oral ruling, *Dow Corning* and § 506(b) are applicable up until the point of confirmation, but no further. *See In re Vinson*, No. 09-36728-BJH-11, Transcript of Ruling on Confirmation (Dkt. No. 183) at 17 (Bankr. N.D. Tex. April 29, 2010).

In fact, the allowance of contract interest rates to apply to so-called "pendency interest," which is interest that accrues after filing of petition but prior to reorganization plan's effective date, is settled law in the Fifth Circuit. *See Matter of Southland Corp.*, 160 F.3d 1054, 1059–60 (5th Cir.1998) (affirming use of default contract rate for period "between pre-bankruptcy default and the effective date of the reorganization plan"). However, the Fifth Circuit has also held that *Till* forecloses the presumption that the contract interest rate automatically applies post-confirmation. *Drive Financial Services, L.P. v. Jordan,* 521 F.3d 343, 350 (5th Cir. 2008).

Further, in this district, Judge Jernigan has also voiced a preference for a "market based approach" to determine post-confirmation interest rates rather than to presumptively apply the contract rate. See *In re Northwest Timberline Enter., Inc.*, 348 B.R. 412, 423 (Bankr. N.D. Tex. 2006). Bankruptcy courts are rightly concerned with ensuring that a creditor gets the "benefit of his bargain" from a solvent debtor until a confirmed reorganization plan is filed; however, after confirmation, the emphasis shifts instead to effecting a plan that comports with § 1129(b)'s requirement that a creditor receives payments totaling the present value of its secured claim (which need not necessarily be the same as what the contract rate would have paid). *Id.*

This Court agrees with Judges Houser and Jernigan. The policy concerns at play post-confirmation are different from the concerns at play during the pendency of a bankruptcy case. Prior to confirmation, § 506(b) requires that a solvent debtor pay the contract rate of interest during the pendency of the case–thus the secured creditor gets the benefit of its bargain, because if the creditor did not receive its prepetition interest rate on an oversecured claim, it would result in a windfall to those holding the equity position. Upon confirmation of a plan of reorganization, a new bargain is made, albeit not at arms length but under the cramdown provisions of the Bankruptcy Code, and § 1129(b) requires that a creditor simply receive the "present value" of his secured claim for a cramdown confirmation to succeed—there is nothing in the Bankruptcy Code to suggest that this value should change with the debtor's level of financial solvency, or to require that the present value pay the creditor a contractual profit margin.

*"Market" Post-Confirmation Interest Rate: Application of Till in Chapter 11*

The Debtor argues that a "market rate," based on a calculation indicative of the ordinary practices of commercial real-estate lenders in the area, is appropriate going forward from the effective date of the Plan. This Court agrees.

In *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2005) , the Supreme Court ruled on the rate of interest that should apply post-confirmation in a Chapter 13 bankruptcy. A majority of the court rejected the bankruptcy court's determination in that case that the contract rate of interest created a "presumptive" post-confirmation rate, holding that such a presumption would incorrectly place the emphasis on ensuring that the individual creditor is made whole. *Id.* at 477. Five members of the court rejected the "coerced loan" approach, where the value of the approved claim is based on what the creditor could earn from making another loan in a similar

situation, and the "cost of funds" method, where the creditor is compensated for the cost of essentially "forwarding" the debtor the capital, for the same reason. *Id.* In an attempt to differentiate the value of a secured claim from what profit the creditor would ordinarily have realized from the particular debtor under his contract, the *Till* Court centered in on the "formula approach" to determine the post-confirmation interest rate for allowed secured claims. *Id*. at 479. The "formula approach" was designed by starting with the prime lending rate, ordinarily given to consumers with a low risk of default, and building in additional interest to compensate for the bankrupt debtor's higher degree of risk.[1] The plurality expressly stated that it believed this approach to most closely comport with the "purposes of the Bankruptcy Code." *Id*. at 479–80. Further, the plurality approved of the prime-plus formula method because it involved what the Court deemed an "objective inquiry" into the sufficiency of the cramdown interest rate.[2] Even though *Till* was a 4-1-4 decision with no majority opinion, the Fifth Circuit did have occasion to opine that an application of the *Marks* rule would yield, at the very least, the determination that five Justices

---

[1] The court went on to elaborate, stating that the resulting "'prime plus' rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." *Till*, 541 U.S. at 479. Such "prior interactions" would logically include any missed payments pre-petition or during the pendency of the bankruptcy, adding further weight to the argument against any default or penalty rate applying after confirmation.

[2] The plurality states that a cramdown provision logically "mandates an objective rather than a subjective inquiry" into the "fair and equitable" analysis, as a creditor cannot be said to have been "crammed down" if he would have consented to the new post-confirmation terms of his own volition. *Till,* 541 U.S. at 476.

disapproved of the "presumptive contract" and "coerced loan" approaches.[3]  *Drive Financial Services,* 521 F. 3d at 350.

Admittedly, *Till* and *Drive Financial* were both Chapter 13 cases and are ambiguous as to their precedential value to Chapter 11 disputes.  The plurality opinion in *Till* included a footnote that highlighted one potential difference between Chapter 11 and Chapter 13 cases and has provided no end of debate in bankruptcy courts as to the appropriate method for calculating post-confirmation interest in Chapter 11:

> "[In Chapter 13], because every cramdown loan is imposed by a court over the objection of the secured creditor, there is no free market of willing cramdown lenders.  Interestingly, the same is *not* true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession . . . .  Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce.  In the Chapter 13 context, by contrast, the absence of any such market obligates courts to look to first principles and ask only what rate will fairly compensate a creditor for its exposure."

*Till*, 541 U.S. at 477 n.14.

Most courts have gleaned from this footnote that they should not "blindly" apply the *Till* formula method in Chapter 11 cases, but should take a cue from the market as well.  *See, e.g., In re Deep River Warehouse, Inc.*, 2005 WL 2319201, at *11 (Bankr. M.D. N.C. 2005) (declining to decide whether *Till* applies to all Chapter 11 cases, but deciding that the formula method is the most appropriate method of calculating the market rate in that particular case); *In re Prussia*, 322 B.R. 572, 590 (Bankr. E.D. Pa. 2005) (attempting to inquire into what rate the current market would produce, but upon failing to find a consensus in market rate, finding that the formula approach was

---

[3]The *Marks* rule stands for the proposition that when a case is decided by a fragmented Supreme Court, the controlling "holding" of the Court may be viewed as that position taken by Justices who concurred on the narrowest common grounds.  *Marks v. U.S.*, 430 U.S. 188, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977).

the best method of calculating an appropriate rate); *But see In re American HomePatient, Inc.*, 420 F. 3d 559, 567 (6th Cir. 2005) (holding that the post-confirmation interest rate produced by the bankruptcy court using the "coerced loan" method was a close enough approximation of what an efficient market would produce that "falling back" on the formula approach was not required).

Even accepting the disparity highlighted in the above-referenced footnote, the Supreme Court recognized the common goals of the bankruptcy court in both Chapter 11 and Chapter 13 cases when it comes to determining an acceptable rate of interest. *See Till*, 541 U.S. at 744. For example, § 1325(a)(5)(B)(ii), which deals with Chapter 13 creditors, and the statutory language applicable to Chapter 11 creditors in § 1129(b)(2)(B)(i) contain the same key terms requiring payment on property which "equals or exceeds the value of the creditor's claim." *Till*, 541 U.S. at 744 n.10. The plurality believed that Congress "intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions. *Id*. at 744. Moreover, it was the plurality's contention that Congress preferred a system of determining rates of interest which were "familiar in the financial community and . . . minimize[d] the need for expensive evidentiary proceedings." *Id*.

In a well-reasoned opinion, Judge D. M. Lynn found that the reasoning in *Till* gave great "guidance" to valuation of both unsecured and secured Chapter 11 claims, with or without an interest rate. *In re Mirant Corp.,* 334 B.R. 800, 821-22 (Bankr. N.D. Tex. 2005). Judge Lynn reasoned that the "taint of bankruptcy" may alter what a market would be willing to pay for a particular debt, and that a better indicator of true value was an objective assessment of the economic characteristics of the collateral and the obligation. *Id.* Like the *Till* opinion, *Mirant* relies on the

similarity between the Chapter 11 and Chapter 13 cramdown provisions as evidence of legislative intent that the two sections be handled in similar manner. *Id.*

This Court agrees that the reasoning in *Till* applies to the basic concept of calculation of the "present value" of secured debt for the purposes of § 1129(b). In many instances, debtors enter Chapter 11 reorganization because of an inability to perform under the contract interest rate. To then require that debtors repay secured creditors at the contract interest rate going forward from confirmation would often impede successful reorganization in a staggering percentage of cases. Bankruptcy Courts have broad powers of equity, and as mentioned by the Fifth Circuit in the *Drive Financial* opinion, the 2005 BAPCPA amendments did not prohibit courts from altering the contractual terms for secured claims, with the exception of those claims secured by mortgages on the debtor's principal residence. 521 F.3d at 347. Confirming a plan of reorganization of debt over the objections of a secured creditor requires simply that the secured creditor receive the full value of his secured claim as of the effective date of the plan. This value, however, is divorced from the specific terms of the original contract, and is instead predicated upon an objective economic assessment. *Till*, 541 U.S. at 479.

To blindly apply the formula from *Till* in the present commercial lending context, beginning with the Prime rate and adding in a percentage for risk, would be, according to expert testimony given in this case by Mr. Dohmeyer, to use a starting point that "no one speaks in terms of." Where there is an established and efficient market, as in the case of oversecured commercial real estate lending, that market does offer useful guidance for a court's determination of the present value of a secured interest. However, an attempt to poll the local market for a consistent rate may yield unworkable results, as in *Prussia*, or subject the debtor to market pricing reflective of the "taint of

bankruptcy." The plain language of the *Till* opinion does not appear to require a court to consider and implement an efficient market rate if one exists, but rather suggests that it "might make sense" to look at the market rate for reference. 541 U.S. at 476 n. 14. However, a significant objective of a bankruptcy court when determining an appropriate rate of cramdown down interest is to arrive at a rate of interest that "reflects the present value of the [creditor's] claim and accounts for the specific level of risk." *T-H New Orleans Ltd. P'ship,* 116 F.3d 790, 801 (5th Cir. 1997). There may be market methods which better reflect the value of the creditor's claim or the quality of the debtor's security than the prime-plus or formula approach. A court of equity must seek out the approach that will most fairly and accurately account for the characteristics of the debtor and the market value of the creditor's claim.

Therefore, with regard to oversecured commercial loans, this Court will employ the formula ordinarily used by the market to derive the appropriate interest rate. Employing such a "market formula" will achieve the Supreme Court's underlying purpose in *Till* of ensuring that secured creditors are compensated for the "time value of their money and the risk of default" by way of an objective assessment, while at the same time employing the on-the-ground insight of an effective market, where it exists.

The Court accepts the uncontroverted expert testimony of Mr. Dohmeyer, and finds that the market rate of interest for a $1.9 million 30-year amortization loan, secured by collateral valued at approximately $2.2 million, with a 5 year balloon payment, is calculated in the industry thusly: beginning with an essentially "risk-free" rate based on the daily 5-year Treasury Bill rate, adding a standard "spread" of 3% based on a debt-to-value ratio of 65%–70%, and adding an additional

percentage value based on economic risk factors.[4]  Using an approach based on the T-Bill rate does not take into account inappropriate factors like the final interest rate Aurora would offer third parties similar to Debtor, but establishes a base interest rate for all credit-worthy borrowers similar to Debtor.  In the words of the Fifth Circuit, the T-Bill rate "includes all necessary factors except the risk premium."  *In re Briscoe Enters., Ltd. II,* 994 F. 2d 1160, 1169 (5th Cir. 1993).  In this case, the Debtor agrees to proceeding with the appraised value of its property of approximately $2.2 million, representing roughly an 82% debt-to-value ratio.  The slimmer loan margin carries with it a higher risk to the creditor, and so rightly warrants an increase in interest.  The post-confirmation interest rate of 6.35% is therefore approved, based on the foregoing calculation.

## I.    Conclusion

The Court finds, based on testimony and exhibits offered by Debtor, that the Amended Plan, as further amended in open court at the confirmation hearing, is feasible should the secured debt owed to Aurora be repaid at a rate of 6.35%.  The Court also finds that Plan payments totaling the amount of Aurora's allowed secured claim at this rate fully compensate Aurora for the value of its claim at the time of filing, per § 1129(b)(2)(A).  Therefore, the Amended Plan, as further amended in open court, will be confirmed.

###End Of Memorandum Opinion###

---

[4]  The Supreme Court was clear, however, that the fact that a debtor is in bankruptcy does not necessarily equate to increased risk, as the Bankruptcy Court's supervision of payment and approval of a viable plan are factors that decrease the likelihood of default.  *Till*, 541 U.S. at n.12.